## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ALI AMIRI,** | |
| Plaintiff, | |
| v. | Case No. 1:20-cv-02006 (TNM) |
| **NATIONAL SCIENCE FOUNDATION**, | |
| Defendant. | |

## MEMORANDUM OPINION

Ali Amiri filed a request under the Freedom of Information Act ("FOIA"), 5 U.S.C.

§ 552, for all records pertaining to him and to one of the National Science Foundation's ("NSF")

grant awards.  NSF responded, but withheld certain information under two FOIA Exemptions.

Proceeding *pro se*, Amiri alleges that those withholdings violate FOIA.  *See* Complaint

("Compl.") ¶ 1, ECF No. 1.

Before the Court are NSF's Motion for Summary Judgment[1] ("Def. MSJ") and Amiri's

Cross-Motion for Summary Judgment ("Pl. MSJ").  *See* ECF Nos. 18, 19.  NSF argues that it

conducted an adequate search for responsive documents, properly withheld responsive

information under applicable exemptions, and satisfied its segregability obligations under FOIA.

Amiri responds that NSF did not conduct an adequate search and that NSF's withholdings violate

FOIA.

---

[1]  The Motion for Summary Judgment appears twice on the docket because the original, ECF No. 14, contained some of Amiri's personal information.  The Court thus directed NSF to refile the Motion redacted or sealed.  *See* Minute Order April 1, 2020; ECF No. 17.  NSF complied and filed a redacted version.  *See* ECF No. 18.

Also before the Court is NSF's Motion to Seal ("MTS") one of Amiri's exhibits, ECF No. 19-1.  NSF argues that the exhibit contains personally identifiable information ("PII") that the agency inadvertently disclosed to Amiri.  The Court temporarily placed the Exhibit under seal pending resolution of NSF's motion.  *See* Minute Order dated May 10, 2021.

For the reasons explained below, the Court will grant NSF's Motion for Summary Judgment and deny Amiri's Cross-Motion.  It will also grant NSF's Motion to Seal.

## I.

This case involves a single FOIA request made by Amiri to NSF seeking all records related to (1) himself, and (2) NSF Grant Award Number 1508680, titled "Transport and Carrier Dynamics Near the Metal-Insulator Transition in VO2."  Declaration of Justin Guz ¶ 7 ("Guz Decl."), ECF No. 14-1; Def. MSJ Ex. 2, ECF No. 14-3 (copy of the FOIA Request).[2]  Amiri requested "any and all of the reports, recordings, and database entries and updates, etc." after 2012 related to him and the grant project.   *See* MSJ Ex. 2.

Amiri claims that he worked as a graduate student on Grant Award No. 1508680.  Defs. MSJ Ex. 2; *see* Pl. MSJ Statement of Facts ¶ 2 ("Pl. MSJ Stmt."), ECF No. 19.[3]  NSF issued that award in September 2015, with a planned end date in 2018.  But because of extensions, the project ultimately ended in 2020.  *See* Defendant's Replies to Plaintiff's Response to Statement of Material Facts ¶ 12 ("Def.'s MSJ Resp."), ECF No. 27-1; *see* Declaration of Sandra Evans ¶¶ 7–12 ("Evans Decl."), ECF No. 27-2.  Amiri stopped work on the project sometime in 2017 or 2018.  *See* Def. MSJ Stmt. Resp. ¶¶ 12, 31; Pl. MSJ Stmt. ¶¶ 5–6.

---

[2]  All page citations refer to the pagination generated by the Court's CM/ECF system.

[3]  Amiri included in his Motion for Summary Judgment his own Statement of Facts ("Pl. MSJ Stmt.") and a Response to NSF's Statement of Facts ("Pl. MSJ Stmt. Resp.").  The Court cites those Statements where applicable, although they share an ECF document number with Amiri's Motion for Summary Judgment.

Amiri sent his request at a time when NSF had a backlog of FOIA requests.  *See* Guz Decl. ¶ 10.  NSF "generally handles this backlog by putting requests into a 'simple track' or 'complex track' depending on the complexity of the request and the time that it will take to search for and review responsive records.  The NSF FOIA Office then responds to FOIA requests in each track on a first in/first out basis."  *Id.*  The FOIA Office reviewed Amiri's Request and placed it in the complex track.  *See id.* ¶ 11.

NSF's Division of Information Services ("DIS") searched the agency's records using Amiri's first name, last name, and email address as search terms.  *See id.* ¶ 18.  The search revealed ten grant award numbers containing documents with at least one search term.  NSF's FOIA staff reviewed those records and determined that nine award numbers had no association with Amiri or his request.  *See id.*  But one award number matched Grant Award No. 1508680.  *See id.*  DIS also conducted an "index" search for any file names or file paths that used Amiri's first and last name or email address as a folder title.  *See id.* ¶ 19.  That search yielded nothing relevant.  *See id.*

NSF then halted its processing of Amiri's request.  *See id.* ¶¶ 9, 20.  Around the same time, COVID-19 forced all NSF staff, including the FOIA Office, to work remotely.  *See id.* ¶ 9.  Although the FOIA staff continued to process requests, processing times lagged.  *See id.* ¶ 12.  Because of existing backlogs and the shift to remote work, NSF did not process Amiri's request within the statutorily required 20 days.  *See id.* ¶ 13; 5 U.S.C. § 552(a)(6)(A).

Frustrated by the delays, Amiri sued.  *See* Compl. ¶¶ 17–23.  NSF resumed the search for responsive records soon after.  *See* Guz Decl. ¶ 21.  The agency identified three Program

Officers who had worked on Grant Award No. 1508680.[4]  One officer no longer worked at NSF.
*See id.*  The other two still worked there but found nothing after searching their emails.  *See id.* ¶
22.

As for the departed Program Officer, NSF could not retrieve his emails because they had
been deleted in accordance with agency policy.  But NSF stores certain emails in "eJacket," the
agency's official recordkeeping system for all documents relating to a specific award.  *See id.* ¶
24.  These documents generally include "the initial grant proposal, review materials, email
correspondence, internal agency program notes, and annual/final reports."  *Id.*  NSF searched the
eJacket system for Grant Award No. 1508680 and located a file containing 549 pages of
responsive records.  *See id.* ¶¶ 24, 26.  The agency reviewed those documents and determined
that Exemptions 5 and 6 of FOIA protected some material from disclosure.  *See* 5 U.S.C.
§ 552(b)(5)-(6); *id.* ¶ 27.

In October 2020, NSF sent its final response to Amiri at his last known address.  *See* Guz
Decl. ¶ 15; Def. MSJ Ex. 4, ECF No. 5 (copy of October 27 Response); Guz Decl. ¶¶ 24, 26.
This mailing apparently went to the wrong address.  *See* Pl. MSJ Stmt. ¶ 10–13; Guz. Decl. ¶ 15–
16.  So NSF collected Amiri's new address and resent its final response in November, this time
in paper format via FedEx.  *See* Guz Decl. ¶ 16.  Amiri continued to say that he had not received
the whole mailing.  *See id.* ¶¶ 24,26; Pl. MSJ Stmt. Resp. ¶ 25; Pl. MSJ Stmt. ¶¶ 15–17.  In
December, NSF sent another copy to Amiri via FedEx.  *See* Guz Decl. ¶ 17; Def. MSJ Ex. 5
(copy of Dec. 10 Response).[5]

---

[4]  Program Officers are visiting scientists who stay with the agency for about three years to
manage grant awards.  *See id.*

[5]  In the final letter, NSF also identified two harmless processing errors.  *See* Def. MSJ Ex. 5.
*First*, NSF initially said that it had located 550 pages of responsive records, but the agency had
counted an email (Bates No. 169) twice.  So NSF retrieved only 549 pages.  *Second*, NSF

Amiri now challenges the adequacy of NSF's search, some of NSF's withholdings and redactions, and whether NSF released all segregable information.  *See* Pl. MSJ Stmt. Resp. ¶¶ 9–10, 12–17, 20–22, 28–31.  His briefs mainly allege that multiple NSF employees stole his intellectual property and forced him off the project.  Amiri also argues that NSF has designed its withholdings to conceal multiple illegal activities that occurred on the project.  *See* Pl. MSJ Stmt. ¶¶ 5–6, 29–31; Pl. MSJ Stmt. Resp. ¶¶ 22, 30–31; Pl. MSJ at 21-24; Plaintiff's Reply to Motion for Summary Judgment at 4, 7. ECF No. 30 ("Pl. Reply").

## II.

The agency bears the burden to show that its search and withholdings comply with FOIA, and the Court reviews those determinations de novo.  *See* 5 U.S.C. § 552(a)(4)(B); *Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981).  "[T]he vast majority of FOIA cases can be resolved on summary judgment."  *Brayton v. Off. of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011).

A court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).  The mere existence of a factual dispute does not preclude summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is "genuine" only if a reasonable factfinder could find for the

---

originally asserted Exemption 6 for redactions on two pages of a "Panel Summary Review" (Bates Nos. 85–86), but NSF did not, ultimately, protect any information on the second page. Thus, the number of pages redacted under Exemption 6 totaled only 28, rather than the 29 pages originally counted*.  Id.*

non-moving party; a fact is "material" only if it can affect the outcome of the litigation. *Id.* at 248. And a court must "view the facts and draw reasonable inferences in the light most favorable to" the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

In FOIA cases, "the agency's identification or retrieval procedure" must be "genuinely in issue" to preclude summary judgment. *Weisberg v. Dep't of Just.*, 627 F.2d 365, 371 n.54 (D.C. Cir. 1980). The agency may rely on affidavits or declarations to obtain summary judgment. *See Judicial Watch v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013). Those documents receive a presumption of good faith that only non-speculative evidence can rebut. *See SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991). But any agency declaration must contain "reasonable specificity of detail" and must not be disputed by contradictory evidence in the record. *Judicial Watch*, 726 F.3d at 215.

Because Amiri is *pro se*, the Court will "liberally construe" his filings. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). That accommodation does not, however, allow him "to ignore the Federal Rules of Civil Procedure." *Oviedo v. WMATA*, 948 F.3d 386, 397 (D.C. Cir. 2020).

### III.

### A.

Amiri challenges the adequacy of NSF's search. NSF must show that it conducted a search reasonably calculated to uncover all relevant documents. *See Weisberg v. Dep't of Just.*, 745 F.2d 1476, 1485 (D.C. Cir. 1984). The Court measures the adequacy of an agency's search under a standard of reasonableness, considering the surrounding circumstances. *See Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990). Searches for responsive records must employ "methods which can be reasonably expected to produce the information requested." *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990); *see Campbell v. Dep't of Just.*, 164

F.3d 20, 27 (D.C. Cir. 1998).  The agency can establish the adequacy of its search via affidavits or declarations that "explain in reasonable detail the scope and method of the search."  *See Morley v. CIA*, 508 F.3d 1108, 1122 (D.C. Cir. 2007) (cleaned up).  Once the agency has provided a "reasonably detailed" declaration, the plaintiff must produce "countervailing evidence" suggesting that a genuine dispute of material fact exists as to the search's adequacy. *Id.* at 1116.

Here, NSF's declarations detail the scope of its searches.  NSF's main declaration identifies the record systems and locations searched, the personnel consulted during the search, why the relevant information would be in those locations and systems, and the search terms used. *See* Guz Decl. ¶¶ 18–29.  The declaration also thoroughly explains the methodology of each search.  *See id.*  And the declarant, Justin Guz, oversaw the searches and therefore has actual personal knowledge.  *Id.* ¶ 3.

Amiri must give a reason to doubt the good-faith presumption afforded to this declaration.  *See SafeCard Servs.*, 926 F.2d at 1200.  He does not.  He instead responds that NSF's search was inadequate because the final release did not include "reports from program managers," "notes and records on the progress of the research," "communications with Principal Investigator[s] and other members of the research team," "unapproved" annual reports, and any communications and edits prompting changes in the Annual Reports, specifically the "third" Annual Report from May 2019.  Pl. MSJ Stmt. ¶¶ 24–28; Pl. MSJ Stmt. Resp. ¶ 20; Pl. Reply at 2; Plaintiff's Answer to Vaughn Index at 18 ("Pl. VI Resp."), ECF No. 19-1.[6]

---

[6] Amiri filed his *Vaughn* Index response as Exhibit B to his Motion for Summary Judgment.  *See* ECF No. 19-1 at 15.  But the Clerk has filed both Exhibits A and B as one ECF filing, so they share an ECF document number.

NSF has fully rebutted this argument.  According to NSF's supplemental declaration, "NSF does not receive actual research data or results from its awardees."  Evans Decl. ¶ 14.  Although the agency "does receive annual reports[] from Senior Personnel," the agency released to Amiri all three responsive Annual Reports.  *See id.* ¶¶ 14–15 (citing Bates 181–91, 251–62, 292–305).  Amiri responds that NSF was still reviewing the third Annual Report at the time of release.  *See* Pl. Reply at 2.  But Amiri received the most recent version available.  *See* Evans Decl. ¶ 15 (citing Bates Nos. 292–305).  The agency also sent the appropriate correspondence folder from eJacket, which contained NSF's written communications with the Principal Investigators and others.  *See id.* ¶ 16; *see* Vaughn Index at 13–16 ("VI"); ECF No. 14-2.

Amiri contends that a more adequate search would have unearthed more emails.  *See* Pl. MSJ Stmt. Resp. ¶ 20.  Yet NSF's email policy mandates the deletion of "transitory email" after 180 days, and email from "non-supervisory personnel, which includes Program Officers," after three years.  *See* Defendant's Reply to Opposition to Motion for Summary Judgment at 4–5, ECF No. 28 ("Def. Reply"); Guz Decl. ¶ 23.[7]  Thus, only a limited number of emails exists on eJacket.  The agency fully searched that database and, despite agency policy, directed two Program Officers to manually search their individual email accounts for responsive records.  *See* Guz Decl. ¶¶ 18–19, 23.

Amiri also suggests that, because DIS's search-term and index searches did not yield any documents, the searches were somehow tainted by agency fraud.  *See* Pl. MSJ at 1–2; Pl. MSJ Stmt. ¶¶ 29–31.  This is speculation.  Such bare allegations cannot overcome the presumption of good faith given to agency declarations.  *See Exxon Corp. v. FTC*, 663 F.2d 120, 126–27 (D.C.

---

[7] *See also* https://www.nsf.gov/policies/records/pdf/GRS%205.2%20010.pdf (available copy of the "Email Retention Policy") (last visited Sept. 6, 2021).

Cir. 1980) ("[I]t is well settled that conclusory allegations unsupported by factual data will not create a triable issue of fact."). Nor does mere speculation that other documents should have been found undermine an otherwise reasonable search. *See SafeCard Servs.*, 926 F.2d at 1201.

Amiri also argues that he should have received investigations completed by the NSF Inspector General ("OIG"). *See* Pl. MSJ Stmt. Resp. ¶ 20; Pl. MSJ at 2. But OIG operates independently from NSF and "handles its own records and FOIA requests." Evans Decl. ¶ 17 (citing 45 C.F.R. § 612.3).[8] NSF's FOIA Office and staff have no access to OIG records. *See id.* More, Amiri never directed his FOIA Request to OIG. *Id.*; *see* Def. MSJ Ex. 2; Compl. Exs. D–E; *see also* NSF Office of Inspector General FOIA Information (instructing that FOIA requests to NSF OIG must be specifically descriptive, omitting any case names, individuals' names, or other identifiable information, and instead including only a date range or referencing a pinpoint citation to the NSF OIG Semiannual Report to the Congress). The agency need not expand its search beyond "the four corners" of Amiri's request. *Kowalczyk v. Dep't of Just.*, 73 F.3d 386, 389 (D.C. Cir. 1996). Amiri appears to acknowledge this point, as he eventually filed a separate FOIA request with OIG. *See* Pl. Reply at 11–12; *see also* Pl. Reply Ex. A, ECF No. 30-1, at 5 (copy of Amiri's May 27, 2021 FOIA Request to NSF OIG) ("OIG FOIA Request").

The agency conducted a full and thorough search. Amiri only speculates in response. The Court thus finds that NSF conducted a reasonable search under the circumstances.

**B.**

In FOIA cases, agencies typically provide their justifications for withholding information in a *Vaughn* index. *See Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973). The Index "permit[s]

---

[8] *See also* "NSF Office of Inspector General FOIA Information" at https://www.nsf.gov/oig/foia.jsp ("[R]equests for OIG records are handled independently by the OIG") (last visited Sept. 10, 2021).

adequate adversary testing of the agency's claimed right to an exemption." *Nat'l Treasury Emps.*
*Union v. U.S. Customs Serv.*, 802 F.2d 525, 527 n.9 (D.C. Cir. 1986).  The Index thus must
contain "an adequate description of the records" and "a plain statement of the exemptions relied
upon." *Id.*

NSF's Index meets that standard.  The Index includes for each withheld record (1) a
description of the record, (2) the corresponding Bates number, (3) a description and reasons for
the redaction, and (4) the FOIA Exemption applied.  *See generally* VI; *see also* Guz Decl. ¶¶ 6,
30–32.  For example, the *Vaughn* entry for Bates No. 180, "Post Award - Budget document
showing specific salary and allocation of person-months per year committed to award 1508680
by senior personnel, students, and administrative staff" notes that the agency redacted, under
Exemption 6, "amounts listed on a proposal budget page that show salary amounts and person-
months worked for senior personnel, students, and administrative staff working on award
1508680."  The entry then justifies application of Exemption 6, noting that "[t]hese individuals
have a privacy interest in their salaries and work schedules not being publicly disclosed," and
that "[t]his information does not shed light on the operations of NSF."  VI at 16.

Given the level of detail and organization, the *Vaughn* Index and its supporting
documents "permit adequate adversary testing of the agency's claimed right to" exemptions.
*Nat'l Treasury Emps. Union*, 802 F.2d at 527.

**C.**

Consider now the applicability of Exemptions 5 and 6 to the information withheld by

NSF.[9]  The Court will discuss each exemption, followed by the aggregate segregability of the

released information

**1.**

Exemption 5 permits the withholding of "inter-agency or intra-agency memorandums or

letters which would not be available by law" to a party in litigation with the agency.  5 U.S.C.

§ 552(b)(5).  Documents "normally privileged in the civil discovery context" need not be

produced under this exemption.  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975).  As

relevant here, that includes documents falling under the common-law deliberative process

privilege, which protects records that "reflect[ ] advisory opinions, recommendations, and

deliberations comprising part of a process by which governmental decisions and policies are

formulated."  *Id.* at 150.

For the deliberative process privilege to apply, the withheld materials must be

"predecisional" and "deliberative."  *Access Reps. v. Dep't of Just.*, 926 F.2d 1192, 1194 (D.C.

Cir. 1991).  Materials "generated before the agency's final decision on the matter" are

predecisional.  *U.S. Fish and Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 786 (2021).

And materials that reflect "the give-and-take of the consultative process" through which the

---

[9]  Amiri originally raised claims under the Privacy Act, 5 U.S.C. § 552a.  *See* Compl. ¶ 1.  NSF asserted Privacy Act Exemption (k)(5) in response, *see* 5 U.S.C. § 552a(k)(5), along with some of the Exemption 6 redactions under FOIA, *see* Guz Decl. ¶ 43 n.1; Def. MSJ Ex. 4.  NSF later withdrew its reliance on the Privacy Act exemption.  Amiri now challenges only the agency's FOIA exemptions and never mentions the Privacy Act except for one phrase in his Complaint. He has thus forfeited any Privacy Act argument, and the Court need not consider it.  *See Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("It is not enough merely to mention a possible arguments in the most skeletal way, leaving the court to do counsel's work . . . .").  Amiri's pro se status does not require otherwise.  *See Oviedo*, 948 F.3d at 397.

agency reaches a decision are deliberative.  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).

Under Exemption 5, NSF withheld material on ten pages of documents.  *See* Bates Nos. 87–92, 171–74.  For eight of those pages, the agency withheld only part of each page.  *See* Bates Nos. 87–92, 173–74.  That information reflected written summaries of a scientific review panel's ("Review Panel") analysis and funding recommendations about a group of proposals, including Grant Award No. 1508680.  *See* Guz Decl. ¶ 34; VI at 12, 15.  NSF withheld in full the other two pages.  Those documents contain a table listing proposals considered by the Review Panel, including the proposal that led to Grant Award No. 1508680.  *See* Guz Decl. ¶ 34; VI at 14.  This withheld document also includes the panel's rankings and funding recommendations for each proposal.  *Id.*

NSF's declarations explain why it withheld this information.  NSF considers each panel's rankings, analysis, and recommendations, but those submissions do not determine the agency's ultimate funding decision.  *See* Guz Decl. ¶ 35.  As a result, the content of these review panel "discussions and deliberations are predecisional in nature."  *Id.*  And these discussions constitute the kind of "opinions, conclusions, and recommendations" protected by the privilege.  *Id.*  For instance, Bates Nos. 173–74 include "*recommendations* of NFS program staff to [] NSF senior staff regarding grant award funding."  *Id.* ¶ 36 (emphasis added).

Amiri offers little in response.  He argues that the withheld material "shows the value of the research proposed" and that "the value and ranking of scientific research should be public information."  Pl. VI Resp. at 21–22.  Not only does this argument not engage with the requirements for the deliberative process privilege, relevant authority exempts similar scientific material.  *See, e.g.*, *Wash. Rsch. Project, Inc. v. Dep't of Health*, 504 F.2d 238, 249–52 (D.C.

Cir. 1974) (finding that deliberative process privilege covered documents reviewed by National Institute of Mental Health personnel in grant application and approval process, who evaluated facts based on their "personal perspective on the material being summarized," which "is a judgmental process, sometimes of the highest order"); *Story of Stuff Project v. U.S. Forest Serv.*, 345 F. Supp. 3d 79, 95–96 (D.D.C. 2018) (finding that documents containing ongoing discussions among Forest Service interdisciplinary team assessing proposals about how to collect data on waterways were properly exempted under deliberative process privilege); *Ctr. for Bio. Div. v. U.S. Fish and Wildlife Serv.*, No. 18-0342, 2021 WL 1209221 at *5–*7 (D.D.C. Mar. 31, 2021) (finding that draft biological evaluations were exempt under deliberative process privilege because they contained "scientific facts and conclusions rather than" policies).

So too here.  Funding recommendations "reflect the personal opinions of the writer rather than the policy of the agency." *Coastal States*, 617 F.2d at 866.  The panels write those recommendations before NSF makes a final funding decision.  Thus, the recommendations are "predicisional."  They also contain internal agency discussions reflecting a "give-and-take of the consultative process" as to the viability of grant submissions.  *Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992).

Amiri briefly argues that the recommendations from graduate students (unlike more senior personnel) do not merit similar protection.  But the privilege particularly applies to recommendations from subordinates, regardless of their rank or academic degree.  *See Wolfe v. Dep't of Health & Human Srvs.*, 839 F.2d 768, 776 (D.C. Cir. 1988) (explaining that subordinates should feel protected to "provide the decisionmaker with their uninhibited recommendations without fear of later being subject to public ridicule and criticism").  The Court therefore agrees that Exemption 5 covers the withheld material.

But NSF must clear one more hurdle.  Even if withheld material properly falls under an exemption, the agency must "reasonably foresee[] that disclosure would harm an interest protected by" the deliberative process privilege.  5 U.S.C. § 552(a)(8)(A)(i)(I).  This foreseeable-harm requirement "imposes an independent and meaningful burden on agencies." *Reporters Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021).  The agency must "concretely explain how disclosure would—not could—adversely impair internal deliberations." *Id.* at 369–70.  That explanation must be "focused and concrete" about why disclosure will "in the specific context of the agency action at issue, actually impede" agency deliberations going forward.  *Id.* at 370.  Perfunctory statements that disclosure would jeopardize the free exchange of ideas within the agency will not suffice.  *See id.*  Nor will "generalized and conclusory" statements that merely "recite the generic rationale for the deliberative process privilege itself." *Id.*

NSF has met that burden here.[10]  The agency broadly says that release of this information "would discourage the expression of candid opinions and inhibit the full and frank exchange of information" inside NSF.  *Id.*  But NSF also more precisely explains how disclosure would cause harm.  The withheld analyses and recommendations on grant proposals represent "just two sets of information considered" when NSF makes grant decisions.  Guz Decl. ¶ 51.  And those recommendations often differ from NSF's ultimate decision on various grants.  *See id.*  So disclosure of just the recommendations would confuse the public and cast doubt on the public basis for NSF's grant decisions.  More, NSF disclosure "would interfere" with the agency's

---

[10]  Amiri does not challenge NSF's foreseeable-harm determination.  Arguably, his failure to do so concedes the issue.  But the D.C. Circuit has described the foreseeable-harm determination as an "independent burden" for the agency to meet.  *Reporters Comm.*, 3 F.4th at 369.  Given this and Amiri's *pro se* status, the Court assumes that his failure to make an argument is not dispositive.

"longstanding use" of these Review Panels, which rely on full candor to continue NSF's "gold standard" for vetting grant proposals. *Id.* This explanation not only places the withheld material in a "specific context of agency action," but also describes how disclosure would "impair" NSF's deliberations going forward. *Reporters Comm.*, 3 F.4th at 369–70. NSF has therefore demonstrated a risk of foreseeable harm from disclosure.

The Court accordingly upholds NSF's withholdings under Exemption 5.

**2.**

Under Exemption 6, NSF withheld 25 pages in full and parts of 62 other pages. That exemption protects "personnel and medical files and similar files" when the disclosure of that information "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).

**a.**

As an initial matter, Amiri argues that NSF has waived any privacy interest—and cannot invoke Exemption 6—based on "inadvertent disclosures" made in the November mailing. *See* Pl. MSJ Stmt. Resp. ¶ 22; Pl. MSJ Stmt. ¶ 22; Pl. Reply at 2–3, 6. Because NSF FOIA staff worked remotely at the time, they outsourced the printing and mailing to FedEx. *See* Evans Decl. ¶ 21. As a result, Amiri received ten pages of documents that mistakenly contained unredacted privileged information. *See id.* ¶ 23; *see also* Pl. MSJ Ex. A [SEALED] at 2–14, ECF No. 19-1. NSF contends that the unredacted information comprises PII of individuals associated with Grant Award 1508680, including salary and student identifications. *Id.* NSF had redacted or withheld this information in the original October release, but mistakenly sent an unredacted PDF to FedEx in November. *See id.* ¶ 24. Because of remote work, nobody uploaded that November mailing to NSF's electronic FOIA system, nor was another copy

otherwise available.  NSF says that it therefore first learned of the mistake in May 2021 when

Amiri filed his reply brief.  *Id.*  Within a day, NSF notified Amiri that it had mistakenly provided

him with privileged information.  NSF requested that Amiri return, destroy, or sequester those

records.  *See id.* ¶ 26; *see* Def. Reply Ex. A, ECF No. 27-3, at 1–2 (copy of correspondence with

Amiri).

　　　NSF argues that the mistaken disclosure does not waive reliance on Exemption 6.

Although an agency cannot assert a FOIA exemption for information that the agency has

officially disclosed to the public, *see Davis v. Dep't of Just.*, 968 F.2d 1276, 1279 (D.C. Cir.

1992), the Court may examine the nature and circumstances of disclosure to determine whether

an agency has waived an exemption.  *See Carson v. Dep't of Just.*, 631 F.2d 1008, 1016 n.30

(D.C. Cir. 1980) ("[T]he extent to which prior agency disclosure may constitute a waiver of the

FOIA exemptions must depend both on the circumstances of prior disclosure and on the

particular exemptions claimed.").  Courts generally find that, when an unintended error leads to

disclosure, the agency has not waived a FOIA exemption.  *See, e.g.*, *Mobley v. CIA*, 806 F.3d

568, 584 (D.C. Cir. 2015) ("Although a FOIA response could [qualify as an official disclosure],

a simple clerical mistake in FOIA processing cannot.").

　　　More, an agency's inadvertent disclosure of individual names and other PII rarely waives

privacy interests under Exemption 6 because those interests belong to the individuals, not to the

agency.  *See Dep't of Just. v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763–66

(1989); *see also Comp. Prof'ls for Soc. Responsibility v. U.S. Secret Serv.,* 72 F.3d 897, 904

(D.C. Cir. 1996) (acknowledging that agency must disclose responsive information for

individuals who "provided [] waivers of their privacy rights").  Amiri presents no evidence that

the individuals associated with this PII have waived their privacy interests.

Ultimately, NSF's statements speak for themselves.  The agency consistently labels this disclosure as inadvertent.  NSF also released redacted versions of the same pages in both October and December.  That further supports the agency's statements that it made a mistake in November.  *See* Evans Decl. ¶ 25.  And once alerted, NSF took prompt steps to protect the unredacted documents from public view, both with the Court, *see generally* MTS, and with Amiri, *see* Evans Decl. ¶ 26.

Amiri does not substantively contest these statements or facts.  Instead, he implies that NSF must have intended disclosure because it gave FedEx unredacted copies after having mailed redacted ones in October.  More plausibly, a remote FOIA staff member mistakenly assembled unredacted pages.  That error was inattentive, but it suggests no wrongdoing or intentionality, particularly given the circumstances and logistical challenges of the FOIA staff's telework.  *See* Evans Decl. ¶¶ 23–24; *see also* Guz Decl. ¶¶ 9, 12.  NSF also worked quickly to resend the release because Amiri's address had changed.  *See* Guz Decl. ¶ 16.  Finally, Amiri never questions NSF's statement that it first learned about the mistake in May.

The Court finds that, under the totality of the circumstances, NSF did not waive its right to invoke Exemption 6.

### b.

The Court next turns to the applicability of Exemption 6.   An agency may rely on that Exemption to withhold "personnel and medical files and similar files" when the disclosure of that information "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).  The term "similar files" covers records about a person that can be identified as applying to that individual, including "bits of personal information, such as names and addresses, the release of which would create a palpable threat to privacy." *Prison Legal News v. Samuels*,

787 F.3d 1142, 1147 (D.C. Cir. 2015) (cleaned up).  "The information in the file 'need not be intimate' to satisfy the standard, and the threshold for determining whether information applies to a particular individual is minimal."  *Milton v. Dep't of Just.*, 783 F. Supp. 2d 55, 58 (D.D.C. 2011) (quoting *N.Y. Times Co. v. NASA*, 920 F.2d 1002, 1006 (D.C. Cir. 1990)).

**i.**

NSF applied Exemption 6 to withhold in full 25 pages of documents.  *See* Guz Decl. ¶ 38; VI at 1–18.[11]  Twenty-three of those pages, *see* Bates Nos. 48–70, contained the "history files" of senior personnel listed on the grant award.  Guz Decl. ¶¶ 39, 41; VI at 6–7.  Those files "consist of tables showing all of the proposals submitted to NSF, both awarded and declined, along with tables showing information about each time the individual served as an NSF reviewer."  Guz Decl. ¶ 39.  NSF states that it needed to "redact the entire table, including rows that may show awarded proposals, because otherwise it would become clear from the redacted portions of the table if, and approximately how many, proposals" NSF declined.  *Id.* ¶¶ 40–41.

NSF also redacted under Exemption 6 parts of 62 other pages.  NSF says these redactions protect PII of individuals involved in Grant Award No. 1508680, including: "student names, personal email addresses, salary information, person-hours allocated to various grants and other employment activities, current financial support to senior personnel and students from entities other than NSF, and NSF review panel member identities."  *Id.* ¶ 43; VI at 1–6, 8–13, 15–18.  NSF redacted some information that "could reasonably be used to determine the identity of the person."  *Id.* ¶ 43.  According to NSF, this type of "indirect disclosure of a record subject's identity would violate the spirit of" Exemption 6.  *Id.*

---

[11]  As discussed above, NSF properly withheld two of those pages, Bates Nos. 171–72, under Exemption 5.  *See supra* III.C.1.

NSF also says that individuals on Review Panels often critique "proposals submitted by colleagues in their same field of study." *Id.* ¶ 42.  NSF thus seeks to protect the identity of those panel members because public disclosure of their reviews could cause "professional harm with the[ir] colleagues whose proposals were critiqued and/or not funded." *Id.*

**ii.**

To analyze NSF's withholdings under Exemption 6, the Court first asks whether disclosure would compromise a "substantial" privacy interest. *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1229 (D.C. Cir. 2008) (cleaned up).  The standard is not demanding; anything "greater than a de minimis" interest is substantial. *Id.* at 1230.

The individuals implicated in NSF's withholdings have a substantial privacy interest in their PII. *See id.* at 1229.  Disclosure of the history tables would put the names of review panel members and employees into the public domain.  A scientist who received no NSF funding would then know how each panel assessed his submission.  As NSF points out, that would lead to professional harm for the reviewers, many of whom share a profession with applicants.[12]  *See* Guz Decl. ¶ 42.

The same concerns animate withholding PII in the other documents.  Disclosure would allow someone to piece together the identity of the grant submitters, the Review Panel members, Program Managers, and other senior personnel.  *See Swan v. SEC*, 96 F.3d 498, 500 (D.C. Cir. 1996) ("Agencies, and hence courts, must evaluate the risk of disclosing records . . . not simply

---

[12]  And even if Exemption 6 did not permit redaction of the history tables and reviews, Exemption 5 would also apply.  *See Almeda v. Dep't of Educ.*, No. 17-cv-2641, 2020 WL 601628 at *4 (D.D.C. Feb. 7, 2020) (finding that documents were deliberative and should thus fall under Exemption 5 and also should come under Exemption 6's protection as information leading to the possible identification of the authors) (collecting cases), *aff'd*, No. 20-5087, 2020 WL 6038697 (D.C. Cir. Aug. 18, 2020).

in terms of what the requester might do with the information, but also in terms of what anyone else might do with it.").  That disclosure would put those people "at risk of being harassed for details."  *Kelly v. CIA,* No. 00–2498, 2002 WL 34463900 at *20–21 (D.D.C. Aug. 8, 2002) (affirming agency's determination to withhold, under Exemption 6, all information that could have identified personnel involved in a research project, where it could have "negatively impact[ed] the perception that both the public and their peers have of them" and where there was a possibility that interested parties might contact them).  And Exemption 6 has long protected the identities of low-level government employees and private individuals, including applicants for federal grants.  *See Common Cause v. Nuclear Reg. Comm'n*, 674 F.2d 921, 938 (D.C. Cir. 1982).

Amiri responds that the withheld material implicates no privacy interests.  None of his arguments persuade the Court, and he rarely rebuts NSF's responses.  He first argues that scientists voluntarily agree to evaluate these grants and thus cannot have private interests in their evaluations.  *Id.* at 19–21; *see also* Pl. MSJ Stmt. Resp. ¶ 29.  The Court disagrees— voluntariness does not outweigh the need to redact PII.  *See Billington v. Dep't of Just.*, 258 F. App'x 348, 349 (D.C. Cir. 2007).

Next, Amiri argues that NSF should release all PII because the agency redacted PII for some individuals, but not others.  *See* Pl. MSJ Stmt. Resp. ¶ 22.  But NSF counters that it released the PII for students "who were [already] associated with this project in the public domain, usually in the form of scientific research publications."  Def. Reply at 11.  The agency released no data for the students not publicly associated with Grant Award 1508680.  NSF contends that this disparate release is not an inconsistency but the agency's efforts to segregate particularized material.  *See id*.  Amiri does not argue otherwise.

Amiri also alleges that NSF should disclose the withheld student PII because it is publicly available on the University of Alabama's website. *See* Pl. MSJ at 16–18; Pl. VI Resp. at 16–17. But NSF has searched the website and confirmed that the redacted student PII does not appear there, and that the website has never routinely posted the type of PII redacted—"anticipated graduation year and ongoing work on a specific grant award." Evans Decl. ¶ 19. Amiri does not rebut NSF's findings, so the Court accepts them.

Finally, Amiri maintains that the salaries of the relevant senior personnel are publicly available at www.open.ua.edu. *See* Pl. MSJ at 18; Pl. VI Resp. at 17–18, 21. NSF did not originally search this specific website because it is neither affiliated with NSF nor contains agency records. *See* Evans Decl. ¶ 20. And Amiri never requested a search for records from the University of Alabama. *See id*. In any event, NSF searched the website in response to Amiri's briefing, and "did not find specific budgeted amounts that were redacted in the NSF award records." [13] *Id*. Again, Amiri provides no countervailing evidence on this point, thereby conceding it.

In sum, the information withheld by NSF implicates a substantial privacy interest. Amiri has not shown otherwise.

### iii.

Once withheld material implicates a substantial privacy interest, the Court must evaluate whether release of that material would constitute a "clearly unwarranted invasion of personal

---

[13] And even if the redacted salaries could be found on the website, the doctrine of practical obscurity would likely provide for redaction of the information in the NSF award records. *See* Evans ¶ 20 (citing *Reporters Comm.*, 489 U.S. at 764, describing the "practical obscurity" standard, and explaining that discrete "compilation of otherwise hard-to-obtain information" differs from public information, and that if the former were "'freely available,' there would be no reason to invoke the FOIA to obtain access to" them).

privacy." *Wash. Post Co. v. HHS*, 690 F.2d 252, 260 (D.C. Cir. 1982) (quoting 5 U.S.C. § 552(b)(6)).  To do so, the Court balances "the privacy interest that would be compromised by disclosure against any public interest in the requested information." *Multi Ag Media*, 515 F.3d at 1228.  On the public interest side of the equation, a requester must show a significant public interest "more specific than having information for its own sake."  *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 172 (2004); *see Blackwell v. FBI*, 646 F.3d 37, 41 (D.C. Cir. 2011).   In fact, "the only relevant public interest" is "the extent to which disclosure of the information sought would shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." *Lepelletier v. FDIC*, 164 F.3d 37, 46 (D.C. Cir. 1999) (cleaned up).  The requested information must advance that interest.  *See Favish*, 541 U.S. at 172. "Information that reveals little or nothing about an agency's own conduct" will not suffice.  *Beck v. Dep't of Just.*, 997 F.2d 1489, 1493 (D.C. Cir. 1993) (cleaned up).

Amiri tries to assert a public interest in disclosure.  He first argues that the release of this information would reveal "the scientific value of the research proposed and conducted by [him as] compare[d] to the other proposals," Pl. VI Resp. ¶ 22, and would "show how much NSF was willing to invest" in Amiri's work.  *Id.* 18–19.  Amiri displays these self-seeking interests through his extensive allegations that both NSF and the University of Alabama conspired to oust him from the project, revoke his visa, and steal his intellectual property.[14]  *See* Pl. MSJ Stmt. ¶¶

---

[14]  The Court takes judicial notice of prior litigation where Amiri already unsuccessfully raised some of these allegations.  *See Amiri v. Gupta*, No. 18-cv-0425, 2018 WL 3548729 at *4 (N.D. Ala. July 24, 2018) (raising claims against the University of Alabama and senior personnel for violating 42 U.S.C. § 1985, due process, and fraud); *Amiri v. Bd. of Tr. of Univ. of Ala.*, 440 F. Supp. 3d 1267 (N.D. Ala. 2020), *appeal dismissed sub nom. Amiri v. Gupta*, No. 20-10964, 2020 WL 5407778 (11th Cir. Aug. 18, 2020); *Amiri v. Barr*, Civ. A. No. 20-cv-0473, 2020 WL 3039258 at *1 (W.D. La. May 7, 2020) (challenging revocation of his visa based on fraud and

5–6, 29–31; Pl. MSJ Stmt. Resp. ¶¶ 22, 30–1; Pl. MSJ at 21–24; Pl. Reply at 4, 7.  More specifically, Amiri claims that NSF used his scientific discoveries to harm him and that the alleged "[w]rongdoers used their influence and power to stop [his] progress, steal his discoveries, and put him in jail for false allegations of visa overstay."  Pl. MSJ at 23.  He states that a "proper FOIA release will bring transparency and truth to" these allegations and that "the wrongdoers will go to jail, not the Plaintiff[,] who is the greatest scientist of this century."  *Id*.

Yet Amiri makes no legal argument for how disclosure of PII would "shed light on [NSF's] performance of its statutory duties," which is the only relevant public interest under Exemption 6.  *Dep't of Def. v. FLRA*, 510 U.S. 487, 497 (1994).  Amiri seeks only to "hav[e] information for its own sake," namely to boost his own notoriety.  *Favish*, 541 U.S. at 172.  And his fraud allegations are beside the point.  He cannot surmount the privacy interest of the mentioned individuals based only on a "bare suspicion" that NSF engaged in misconduct.  *Favish*, 541 U.S. at 174.  Nor is NSF obligated under FOIA to answer substantive questions presented in the guise of a document request, or by extension through this litigation.  *See Schoenman v. FBI*, 573 F. Supp. 2d 119, 140 (D.D.C. 2008).

In this same vein, Amiri conjectures that the Principal Investigators inserted themselves into NSF's FOIA review and made their own redactions.  *See* Pl. MSJ Stmt. Resp. ¶¶ 22, 30; Pl. Reply at 3–4.  He believes this to be true based on nuanced stylistic differences between certain redactions.  *See id*.  In response to these allegations, NSF again reviewed the record and confirmed that only NSF FOIA staff made the redactions.  *See* Evans Decl. ¶ 19.  Amiri offers no substantive reason to doubt that finding.  Instead, he invites the Court to speculate, which it

---

misrepresentation about his termination from the NSF Grant project), *report & rec. adopted*, 2020 WL 3039132 (W.D. La. June 5, 2020) (dismissed with prejudice).

cannot do.  "[I]t is well settled that conclusory allegations unsupported by factual data will not create a triable issue of fact." *Broaddrick*, 139 F. Supp. 2d at 65 (cleaned up).  Simply put, Amiri's broad and generalized allegations do not state a public interest.[15]

Amiri also suggests that the public has a greater interest in the activities of senior personnel who, thanks to their higher positions, have only a *de minimis* privacy interest.  *See id.* at 20–22.  True, more senior employees might enjoy a diminished privacy interest.  *See, e.g.*, *Stern v. FBI*, 737 F.2d 84, 92-94 (D.C. Cir. 1984) (withholding names of lower-level employees, but not an FBI Special Agent).  But courts typically lower that interest when evidence abounds that senior personnel engaged in misconduct.  *See Beck*, 997 F.2d at 1493 ("It suffices to note that the public interest identified in *Stern* was based on the widespread knowledge that certain FBI employees had been censured . . . .").  Amiri points to "no evidence, let alone any public knowledge, that wrongdoing" occurred at NSF.  *Id.*  He only alleges wrongdoing, and without any support.

Alternatively, Amiri argues that the Federal Funding Accountability and Transparency Act ("FFATA") of 2006 requires disclosure of all information about NSF grants, including associated budgetary details.  *See* Pl. MSJ at 19–20; Pl. VI Resp. at 19–21.  NSF says that it has posted all required information about its grants to www.USASpending.gov—the official source for spending data for the U.S. Government.[16]  And FFATA disclosures include total award

---

[15] Amiri also argues that records of a proposed disciplinary action should be public record.  *See* Pl. VI Resp. at 16.  He offers no legal arguments in support.  In any event, Exemption 6 withholds potential and actual disciplinary measures.  *See Bloomgarden v. Dep't of Just.*, 874 F.3d 757, 760–62 (D.C. Cir. 2017) (withholding under Exemption 6 a letter describing a prosecutor's grounds for termination).

[16] *See* FFATA Subaward Reporting System, About FSRS, available at https://www.fsrs.gov/ (last visited Sept. 8, 2021).  Specific information on Grant Award No. 1508680 is publicly available at "Project Grant FAIN 1508680,"

amounts, not budget breakdowns.  *See* FFATA, § 2(b)(1)(B); Def. Reply Ex. B (showing only total amounts).  NSF says that none of the withheld information therefore need be disclosed under FFATA.  Amiri again offers no argument to the contrary.

Amiri has not identified a public interest in disclosure that would outweigh the interest of various individuals in their PII.  *See Wash. Post*, 456 U.S. at 599.  The Court therefore has no counterweight on the FOIA scale against the asserted privacy interest.  *See Favish*, 541 U.S. at 174-75.  The Court thus agrees with NSF that Exemption 6 protects the PII at issue.

### iv.

NSF must show that disclosure of the PII at issue would harm the interests protected by Exemption 6.[17]  Admittedly, NSF does not expressly address this requirement for its Exemption 6 withholdings.  But a court may find the foreseeable-harm requirement satisfied if "the very context and purpose of" the withheld material "make[s] the foreseeability of harm manifest." *Reporters Comm.*, 3 F.4th at 372.

NSF's declarations and the context of the withheld material make out a foreseeable harm. As NSF explained, disclosure of the history tables would "cause professional harm" to the individuals listed in those documents.  Guz Decl. ¶ 42.  That information would allow others to see not only who was denied NSF funding but also who reviewed the proposals that received no funding.  *See id.* ¶ 38, 42.  NSF suggests that such knowledge would anger applicants whose proposals received no funding and would cause them to ridicule those who did.  *See id.*  The Court agrees.

---

https://www.usaspending.gov/award/ASST_NON_1508680_4900 (last visited Sept. 16, 2021); *see* Def. Reply Ex. B, ECF No. 27-4 (copy of publicly available budgetary information).

[17] Amiri again does not challenge this aspect of NSF's declarations, but the Court analyzes the issue anyway.

And for the student PII that NSF withheld in 62 partially redacted pages, that information pertains to individuals who were "involved in the award." *Id.* ¶ 43.  That information therefore exists in the same context as the material in the history tables—disclosure would identify the person and, depending on their involvement, might subject them to ridicule.  Thus, the "context" of the information in those 62 pages makes "manifest" the harm from disclosure.  *Reporters Comm.*, 3 F.4th at 372.  NSF has shown a risk of foreseeable harm from disclosure of this information.

NSF therefore properly invoked Exemption 6 as to all redacted and withheld information.

### 3.

Finally, the Court must assess the segregability of the released information.  Under FOIA, an agency must disclose "all reasonably segregable, nonexempt portions of the requested record(s)." *Roth v. Dept. of Just.*, 642 F.3d 1161, 1167 (D.C. Cir. 2001).  The agency must provide "a detailed justification and not just conclusory statements to demonstrate that all reasonably segregable information has been released." *Valfells v. CIA*, 717 F. Supp. 2d 110, 120 (D.D.C. 2010).  A declaration describing a review of the documents and a *Vaughn* index describing each withholding satisfy the segregability requirement.  *See Loving v. Dep't of Defense*, 550 F.3d 32, 41 (D.C. Cir. 2008); *Johnson v. EOUSA*, 310 F.3d 771, 776 (D.C. Cir. 2002).  The Court presumes that an agency has complied with its obligation to release segregable material.  *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).  The requester must provide some "quantum of evidence" to overcome that presumption.  *Id.*

Here, the NSF says that it reviewed the responsive documents more than once and produced all non-exempt and segregable information.  *See* Guz Decl. ¶¶ 35, 46–48; Evans Decl. ¶ 19.  The agency conducted a "line-by-line review" to identify information exempt from

disclosure.  Guz Decl. ¶ 47.  These representations suffice.  And, as discussed above, the *Vaughn*

index adequately describes the withheld documents.  *See generally* VI.  Amiri has provided no

reason to doubt that the agency met its segregability obligation.  *See Johnson*, 310 F.3d at 776.

Thus, the Court holds that NSF has satisfied its segregability obligations under FOIA.

### IV.

NSF moves to seal Amiri's Exhibit A, attached to his Motion for Summary Judgment,

ECF No. 19-1 at 2–14.  The Exhibit contains the documents that the agency inadvertently sent

unredacted to Amiri in November 2020.  *See* Pl. MSJ Ex. A [SEALED] at 2–14; *see also* Bates

Nos. 178, 180, 187, 188, 258, 259, 260, 300, 301, and 547.

Any consideration of a motion to seal begins with "a strong presumption in favor of

public access to judicial proceedings*." Hardaway v. DCHA*, 843 F.3d 973, 980 (D.C. Cir. 2016).

But "that presumption may be outweighed in certain cases." *Metlife, Inc. v Fin. Stability*

*Oversight Council*, 865 F.3d 661, 665 (D.C. Cir. 2017).  The Court considers six factors when

presented with a motion to seal: (1) the need for public access to the documents at issue; (2) the

extent of previous public access to the documents; (3) that someone has objected to disclosure,

and the identity of that person; (4) the strength of any property and privacy interests asserted; (5)

the possibility of prejudice to those opposing disclosure; and (6) the purposes for which a party

introduced the documents during the judicial proceedings.  *See id.*

Here, the Court has already addressed factors (1) through (5) when it affirmed NSF's

withholdings under Exemption 6.  Admittedly, factor (6) favors disclosure—Amiri submitted the

Exhibit "to influence a judicial decision." *Cable News Network, Inc. v. FBI*, 984 F.3d 114, 121

(D.C. Cir. 2021).  But that one factor does not outweigh that the other five, which favor sealing

the document.  Many individuals have a strong privacy interest in the unredacted PII and Amiri

has not shown that the public should see that information.  The Court therefore agrees to seal the Exhibit.  Amiri's counterarguments directly mirror his arguments in opposition to summary judgment, *see* Opposition to Motion for Order to Seal at 1–9, ECF No. 29, which the Court has already addressed.

Thus, the Court will grant NSF's Motion for Order to Seal, and ECF No. 19-1 will be permanently sealed.

## V.

The Court also considers Amiri's other arguments that seem to apply across both his FOIA challenge and his opposition to sealing Exhibit A.

Amiri appears to accuse NSF of bad faith.  Beyond his fraud allegations, he focuses at length on the delays in processing and in delivering the final release.  *See* Pl. MSJ Stmt. Resp. ¶¶ 1, 4–5, 9, 23–24; Pl. MSJ Stmt. ¶¶ 10–22; Pl. Reply at 2, 5–6.  He also objects to the inconsistencies between the October, November, and December mailings, including the differences in the redactions, number of pages released, and the lack of Bates numbers in the October release.  *See* Pl. MSJ Stmt. Resp. ¶¶ 22, 25–26, 30; Pl. MSJ Stmt. ¶¶ 7–9; Pl. Pl. Reply at 2–4.

The Court credits NSF's explanations for the delays and the differences in the redactions and page numbers.  According to the agency, a backlog, an administrative error, and remote work during COVID-19 caused these issues.  *See* Guz Decl. ¶¶ 6, 12–13, 25, 27; Evans Decl. ¶¶ 21–26.  Amiri does not refute those purported causes.  And NSF attempted, in good faith, to send the correct version to Amiri in October, *see* Guz Decl. ¶ 15, 24, 26; Def. MSJ Ex. 4.  He in fact received the full and final version via re-release in December.  *See* Evans Decl. ¶ 25; Guz Decl. ¶ 17; Def. MSJ Ex. 5; *see also Meeropol v. Meese*, 790 F.2d 942, 952 (D.C. Cir. 1986)

(holding that initial agency noncompliance does not always reflect bad faith and that later compliance can cure any previous deficiency).  More, Amiri's own change in address partially caused the delay.  *See generally* ECF No. 11; *see also* Guz Decl. ¶ 15–16.  And the lack of Bates numbers on the October and November productions strikes the Court as sloppy, not suspicious.

Amiri also complains of a delay of less than one year in the agency's processing of his request.  Courts routinely find that longer delays do not suggest agency bad faith.  *See Skurow v. DHS*, 892 F. Supp. 2d 319, 326 (D.D.C. 2012) (one-year delay insufficient for finding agency bad faith; claims of bad faith were purely speculative); *Competitive Enter. Inst. v. Nat'l Aeronautics & Space Admin.*, 989 F. Supp. 2d 74, 88–89 (D.D.C. 2013) (two-year delay not bad faith); *Thomas v. Dep't of Justice*, 531 F. Supp. 2d 102, 109 (D.D.C. 2008) (three-year delay in agency's response to FOIA request not "purposeful" and absent other evidence did not suggest bad faith); *Goland v. CIA*, 607 F.2d 339, 355 (D.C. Cir. 1978) ("[I]n view of the well-publicized problems created by the statute's 10- and 20-day time limits for processing FOIA requests and appeals, the CIA's delay alone cannot be said to indicate an absence of good faith.").  The Court accordingly finds no evidence of agency bad faith.

Lastly, Amiri states in his Reply that the Court should now oversee and presumably adjudicate his new pending OIG FOIA Request and another new FOIA Request that he submitted to NSF in June 2021.  *See* Pl. Reply at 11–12 (citing OIG FOIA Request and Pl. Reply Ex. B, ECF No. 30-2, at 3—a copy of June 10, 2021 FOIA Request) ("New NSF FOIA Request").  He argues that the OIG FOIA Request and the New NSF FOIA Request "cannot be litigated in another FOIA lawsuit."  Pl. Reply at 12.  Amiri is mistaken.  Because he has filed new and separate FOIA Requests (and filed them after NSF's final release) those requests will

receive their own judicial review if necessary later.  And NSF's OIG is not a defendant here, nor has Amiri moved to join it as a defendant.

More still, a requester may not expand the scope of his FOIA request(s) during litigation. *See, e.g.*, *Houser v. Church*, 271 F. Supp. 3d 197, 204 (D.D.C. 2017); *Donoghue v. Office of Info. Policy, Dep't of Justice*, 157 F. Supp. 3d 21, 23 n.2 (D.D.C. 2016).   Nor may a plaintiff, even a *pro se* one, raise new claims at the summary judgment stage, particularly not in an opposition or reply, when a defendant has little to no chance to prepare and respond.  *See Sai v. Transp. Sec. Admin.*, 315 F. Supp. 3d 218, 234 (D.D.C. 2018) ("Although *pro se* litigants are entitled to some leeway, they must comply with the Federal Rules of Civil procedure, and a plaintiff—even a *pro se* plaintiff—may not amend the complaint by raising an issue for the first time in a brief in opposition to a motion for summary judgment.") (cleaned up).  The Court thus declines to consider issues relating to Amiri's OIG FOIA Request and New NSF FOIA Request.

## VI.

For these reasons, the Court will grant NSF's Motion for Summary Judgment and NSF's Motion for Order to Seal.  The Court will deny Amiri's Cross-Motion for Summary Judgment. A separate Order will issue.

Dated: September 28, 2021                              TREVOR N. McFADDEN, U.S.D.J.